## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KIMBERLY SMITH,
      Plaintiff,

    vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:12-cv-904

Barrett, J.

Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. §405(g) and 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's applications for disability insurance benefits (DIB) and supplemental security income

(SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 6), the

Commissioner's response in opposition (Doc. 11), and plaintiff's reply memorandum. (Doc. 12).

## I.  Procedural Background

Plaintiff filed applications for DIB and SSI in October 2008, alleging disability since

August 1, 2007 due to back and mental health impairments. These applications were denied

initially and upon reconsideration. Plaintiff, through counsel, requested and was granted two de

novo hearings before administrative law judge (ALJ) Christopher B. McNeil. Plaintiff, two

medical experts (ME), and a vocational expert (VE) appeared and testified at the ALJ hearings.

On June 23, 2011, the ALJ issued a decision denying plaintiff's DIB and SSI applications.

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ

the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2011.

2. The [plaintiff] has not engaged in substantial gainful activity since August 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: degenerative disc disease, degenerative joint disease, a major depressive disorder with dysthymia, a bipolar disorder, post-traumatic stress disorder (PTSD), and an obsessive compulsive disorder with an eating disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she cannot lift/carry more than 20 pounds occasionally and 10 pounds frequently. She can push/pull within the same lift/carry weight restrictions. She cannot climb ladders, ropes, or scaffolds. She can climb ramps and stairs occasionally. She can balance, kneel, crouch, crawl, and stoop occasionally. She can understand, remember, and carry out simple and detailed tasks and some complex tasks. She can interact no more than occasionally with supervisors, coworkers, the general public, and small group settings. She cannot perform fast-paced work with high production demands.

3

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1965, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from August 1, 2007, through the date of this decision (20 C.F.R. 404.1520(g)) and 416.920(g)).

(Tr. 19-27).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[1] Plaintiff's past relevant work was as a material handler and a group worker.  (Tr. 26, 277).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Medical Evidence**

The following is a summary of the relevant evidence related to plaintiff's mental health impairments.

Plaintiff began mental health treatment at the Greater Cincinnati Behavioral Health Services ("GCB") Central Clinic in June 2005. (Tr. 510-19). At the time of her initial assessment, plaintiff's diagnoses were identified as major depressive disorder and dysthymic

5

disorder. (Tr. 518). She was assigned a Global Assessment of Functioning (GAF) score of 30.[2] *Id.* Plaintiff was referred for counseling/psychotherapy and medical-somatic services. (Tr. 519).

Plaintiff began receiving medical-somatic services at GCB with psychiatrist Lisa Ford-Crawford, M.D., on October 4, 2005. (Tr. 507-09). Dr. Ford-Crawford diagnosed major depressive disorder, dysthymic disorder, anxiety and prolonged PTSD. (Tr. 508). Dr. Ford-Crawford assigned a GAF score of 40. (Tr. 509).

By August 2007, plaintiff reported to her counselor that she had no hobbies, no interests, and that she had withdrawn from and lost interest in almost all activities. She did not sleep for more than three hours per night and engaged in behavior to try to avoid sleep because she was trying to avoid nightmares. She had low energy and low self-esteem, and was feeling worthless. (Tr. 441, 479, 691, 737).

The record shows that plaintiff has a long history of suicidal ideation and attempts. In November 2006, plaintiff reported that she had some suicidal thoughts and she was hearing a voice tell her she should "just kill herself." (Tr. 475). In July 2007 she took a handful of pills. (Tr. 451). In September 2009, it was noted she was suicidal after a survivors' group therapy session. (Tr. 788). In February 2010 she admitted to her doctor that she had attempted suicide a few weeks prior. (Tr. 783).

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. GAF scores of 21 to 30 indicates an individual that is "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends)." *Id*. at 32.

6

Dr. Ford-Crawford placed plaintiff on a "contract for safety" at least three times between 2005 and 2010. (Tr. 698, 731, 760, 783).

A consultative examining psychologist, Norman L. Berg, Ph.D., examined plaintiff on behalf of the state agency on March 3, 2008. (Tr. 523-29). Plaintiff reported that she had experienced depression and anxiety attacks since her teenage years. She had been hospitalized a few times for self-destructive thoughts and gestures, the last of which was about two years ago. She was hospitalized for one day in 2006 due to side effects of Effexor. She had been involved in mental health treatment "on and off since my 20's." Plaintiff reported that she was visiting a mental health clinic biweekly, and had done so for a year. When discussing plaintiff's insight, Dr. Berg noted that "[i]t seems that claimant is concerned about telling her therapist how she feels at times because she is concerned she might be hospitalized because of this." (Tr. 527). Dr. Berg found her thought processes were goal-directed. She was neither circumstantial nor tangential. She stated she cried almost daily. She was depressed over emotional problems her 14-year old daughter was having, financial concerns, not working, and underlying feelings of anger. She had a somewhat blunted affect. Her ability to concentrate was fair. She did the chores at home. Dr. Berg diagnosed plaintiff with a depressive disorder, moderate with anger and mild anxiety and assigned her a GAF score of 55. (Tr. 527-28). Dr. Berg opined that plaintiff would have no limitation in her ability to understand and follow simple verbal directions; mild limitations in her abilities to maintain attention and concentration while doing work-related tasks and to relate adequately with others in the work setting; and moderately limited in her ability to cope with routine job stress. (Tr. 529).

7

Nicole A. Leisgang, Psy.D, examined plaintiff on behalf of the state agency on April 27, 2009. (Tr. 642-47). Plaintiff reported that she was supported by unemployment benefits. She described herself as continually anxious and depressed. She also reported that she had been raised in foster homes and had been abused. She spent most of her time at home, took her daughter to school, and watched TV and listened to music. She did the chores, fixed meals, and shopped for groceries. She appeared to be anxious. Her attention and concentration skills were marginally adequate. Dr. Leisgang diagnosed plaintiff with major depressive disorder, recurrent and severe without psychotic features and an unspecified anxiety disorder. Dr. Leisgang assigned plaintiff a GAF score of 45. (Tr. 646). Dr. Leisgang opined that plaintiff's ability to relate to others including fellow workers and supervisors was seriously impaired. Dr. Leisgang noted that plaintiff was cooperative during the evaluation but also appeared to be anxious and depressed. She has limited contact with anyone other than family. She alluded to withdrawal and avoidant behavior. She may have difficulty relating adequately to others in completing simple repetitive tasks. Plaintiff's ability to understand, remember, and follow simple instructions was mildly impaired as she would have no difficulty understanding or retaining simple instructions, as her short-term memory skills were at least marginally adequate. Dr. Leisgang did note, however, that her pace may be slowed by her depressive symptomatology. (Tr. 646). According to Dr. Leisgang, plaintiff's ability to maintain attention, concentration, persistence, and pace was mildly impaired and her ability to withstand the stress and pressure associated with day-to-day work activity was seriously impaired. Such stress may result in increased anxiety and decreased attention and concentration skills, but might also result in increased panic attacks and avoidant behavior. It might also exacerbate symptomatology

8

associated with Post Traumatic Stress Disorder, interfering with her ability to relate adequately to others. It may lead to such increased depressive symptomatology as crying, withdrawal, and slowed work performance. (Tr. 647).

In June 2009, non-examining reviewing psychologist Patricia Semmelman, Ph.D., reviewed the record and opined that plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. (Tr. 660). Dr. Semmelman opined that plaintiff was able to interact occasionally and superficially with others and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting. She was able to cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand. (Tr. 667). Dr. Semmelman's assessment was affirmed in October 2009 by another state agency psychologist, Marianne Collins, Ph.D. (Tr. 677).

In October 2010, Dr. Ford-Crawford completed a mental impairment questionnaire. (Tr. 804-10). Dr. Ford-Crawford listed plaintiff's diagnoses as prolonged PTSD, an eating disorder, bipolar affective disorder, and chronic pain syndrome. (Tr. 804). She assigned plaintiff a GAF score of approximately 40. *Id.* Dr. Ford-Crawford reported that plaintiff suffered from: "Recurrent thoughts of past traumas; overwhelming anxiety, anger, and depression; hyper-vigilance, racing thoughts all prevent pt. from functioning on more than a limited level." (Tr. 806). Dr. Ford-Crawford found plaintiff was extremely limited in all functional domains. (Tr. 807). Dr. Ford-Crawford further noted that plaintiff had been contracted to safety more than three times in the prior twelve months. (Tr. 809).

9

Plaintiff's case manager, Angie Hardin, testified at both administrative hearings. At the December 17, 2010 hearing, Ms. Hardin testified that she had been plaintiff's case manager for the past four years. (Tr. 96). Ms. Hardin discussed how plaintiff was placed on at least three contracts for safety. (Tr. 96-100). These contracts for safety were put in place as a way for plaintiff to be "honest about her symptoms"; however, if plaintiff felt like they were trying to have her hospitalized, it made things worse. (Tr. 98). Ms. Hardin noted plaintiff's symptoms included agitation, anger, depression and withdrawing from services and "when her symptoms increase she will stop answering the phone." (Tr. 99). Ms. Hardin also discussed the "balancing act" of trying to keep plaintiff engaged in her therapy at the right level. (Tr. 100). Ms. Hardin testified that missing appointments and medication was part of plaintiff's condition. (Tr. 102).

At the May 17, 2011 hearing, Ms. Hardin testified that while returning to employment is part of positive goal setting and is something plaintiff expressed a desire to do, her condition prevented her from any employment. (Tr. 57-60).

Medical expert Mary Buban, Psy.D., completed interrogatories on January 21, 2011, and testified at the May 17, 2011 administrative hearing. Based on her review of the record, Dr. Buban specified plaintiff's mental impairments as major depression, dysthymia, manic depression, bipolar, depression, obsessive compulsive disorder/eating disorder and prolonged PTSD. (Tr. 836). Dr. Buban opined that plaintiff had mild restrictions in her activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 837). Dr. Buban noted that plaintiff had a long history of starting and stopping treatment with periods of time off her medication. *Id.* Dr. Buban noted that plaintiff had recently stopped attending therapy when her therapist referred her to group

10

treatment. *Id.* Dr. Buban also considered that plaintiff had many psychosocial stressors,

including the legal problems of her older children. *Id.* Dr. Buban also considered the fact that

plaintiff received unemployment benefits until August 2010 and sought work as a home

healthcare aide and childcare worker. *Id.* Dr. Buban recognized that plaintiff's mental health

records reflected reports of hallucinations. *Id.* Dr. Buban opined that plaintiff's impairments did

not equal or meet any listed impairment. (Tr. 838). Dr. Buban concluded that plaintiff retained

the capacity to perform work that accommodated simple, detailed and some complex tasks,

occasional interaction with supervisors, co-workers and the public in small groups, and no fast-

paced or high-production demands. (Tr. 840).

   As discussed further *infra*, Dr. Ford-Crawford wrote a letter on March 7, 2011, wherein

she expressed her disagreement with Dr. Buban's assessment. She opined that Dr. Buban was

unable to appreciate the complexity of the combined effect of plaintiff's physical and mental

impairments, noting that malnourishment from plaintiff's eating disorder affected her

concentration and cognition. She stated that "[i]t would be impossible for anyone with actual

contact with this patient to say she has mild restriction of [activities of daily living]." (Tr. 842).

Dr. Ford-Crawford reported that plaintiff has difficulty leaving her home and will stay on her

couch unless absolutely necessary due to fear and anxiety from past trauma. Dr. Ford-Crawford

further noted that plaintiff has been unable to get appropriate doses of medication for years due to

her eating disorder and reiterated her opinion that plaintiff has severe limitations in her ability to

concentrate. She reported that plaintiff is unable to sit still even in the doctor's waiting room.

Lastly, Dr. Ford-Crawford stated that "[i]f there are any inconsistencies in my records than its

11

would only be that I neglected to convey the severity of [plaintiff's] symptoms in my progress notes." (Tr. 842-43).

**E. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred by failing to consider relevant evidence; (2) the ALJ's credibility determination is not substantially supported; and (3) the ALJ erred by discounting the weight given to the opinions of plaintiff treating psychiatrist. (Doc. 6). For the reasons that follow, plaintiff's assignments of error should be sustained.

1. The ALJ mischaracterized substantial evidence on plaintiff's mental impairments.

Plaintiff's argument for her first assignment of error is two-fold: (1) the ALJ improperly ignored substantial medical evidence; and (2) this evidence establishes that plaintiff meets or medically equals a Listing and is therefore disabled. The primary evidence at issue is a notarized transcript from an April 29, 2011 recorded telephone interview of plaintiff's treating psychiatrist, Lisa Ford-Crawford, M.D. (Tr. 871-77). In the interview, Dr. Ford-Crawford reported that she has treated plaintiff for depression, bi-polar disorder, anxiety, and post-traumatic stress disorder (PTSD) for over five years and sees her at least once a month, sometimes bi-monthly. (Tr. 870-71). Dr. Ford-Crawford further reported that plaintiff suffers from PTSD resulting from prior sexual and physical abuse, depression, and anxiety disorders. (Tr. 872). Dr. Ford-Crawford stated that plaintiff also has an eating disorder that "has definitely been an issue." *Id.* Plaintiff has cravings for starch, corn starch, and paper, and she has consumed large amounts of these materials which has resulted in gastrointestinal problems. (Tr. 873). Dr. Ford-Crawford further stated that plaintiff experiences depression with periods of suicidal ideation, appetite disturbance, psychomotor agitation and feelings of guilt or worthlessness. (Tr. 873-76). According to Dr.

12

Ford-Crawford, plaintiff's PTSD is based upon recollections of traumatic experiences which cause her marked distress in the form of nightmares and flashbacks. (Tr. 872, 874). Regarding plaintiff's issues with complying with medical treatment, Dr. Ford-Crawford explained that plaintiff has continued to want treatment; even when she was non-compliant in seeing Dr. Ford-Crawford, plaintiff would be in contact with her case manager. As far as medications, Dr. Ford-Crawford stated that "part of [plaintiff's] initial anxiety and related to the eating disorder was feeling like she was being choked when she was swallowing any type of medication. We had to work on that for a long time; probably months before she even felt comfortable enough to take the medication regularly. We ended up trying some dissolvable medication to initially get her feeling comfortable or calm enough to continue taking meds." (Tr. 876).

Plaintiff contends that the ALJ erred by not considering this evidence as required by 20 C.F.R. § 404.1520(a)(3). Plaintiff maintains that this interview, taken together with Dr. Ford-Crawford's written opinion and treatment notes, comprises medical opinion evidence that plaintiff meets or medically equals Listings 12.04 and 12.06. The Court will first address whether the ALJ considered the April 2011 telephonic interview evidence from Dr. Ford-Crawford.

Social Security Regulations provide that the ALJ is to "consider all evidence in [a claimant's] case record when [making] a determination or decision whether [a claimant is] disabled." 20 C.F.R. § 404.1520(a)(3). Here, the record reflects that the April 29, 2011 interview of Dr. Ford-Crawford was mailed to the ALJ by plaintiff's counsel on May 5, 2011 (Tr. 870); the ALJ issued his decision on June 23, 2011. (Tr. 28). At the initial ALJ hearing, held on December 17, 2010, the ALJ instructed plaintiff's counsel that he was to submit additional

13

evidence, if necessary, within seven days of the hearing absent a written application and finding

of good cause to extend this deadline. (Tr. 78-79). The ALJ subsequently issued interrogatories

to the medical expert Mary Buban, Ph.D., which were completed on January 21, 2011 (Tr. 840),

after the December 27, 2010[1] deadline for submission of evidence. Plaintiff then submitted 37

additional pages of evidence: a statement of Dr. Ford-Crawford; Dr. Ford-Crawford's treatment

notes from November 24, 2010 to April 8, 2011; and the interview transcript. (Tr. 841-77). This

evidence was submitted after the deadline set at the initial ALJ hearing but prior to the

commencement of the supplemental ALJ hearing. The ALJ admitted these records into evidence

but also reiterated his prior deadline and stated that "absent a written application and a finding of

good cause [he] would issue a decision without [the additional] material pursuant to HALLEX

I2720." (Tr. 39). After admitting the "late" submitted evidence, the ALJ again held the record

open for submission of additional materials until May 25, 2011. (Tr. 40).[2] In his decision, the

ALJ briefly referenced two pages from the late-submitted treatment notes in support of his

determination that plaintiff is not credible and cited to the written opinion and interview

transcript simply to identify that he was giving the opinions less weight. (Tr. 24-25). The

decision contains no further reference to this evidence. In contrast, the ALJ provided more

detailed summaries of plaintiff's other psychiatric treatment notes and the findings of Dr. Ford-

Crawford in the portion of his decision discussing the severity of plaintiff's conditions. (Tr. 21).

     Plaintiff asserts the ALJ erred by failing to address the "late" evidence submitted by

counsel as he is required to consider all record evidence in assessing plaintiff's disability claim

---

[1]While the ALJ provided for a seven day deadline from December 17, 2010, by which to submit additional materials, at the second hearing the ALJ stated that the deadline was December 27, 2010. (Tr. 39).

[2]The undersigned is unclear as to why the ALJ admonished plaintiff's counsel for submitting evidence from Dr. Ford-Crawford in April 2011, prior to the supplemental hearing, when the ALJ himself expanded the record by

pursuant to 20 C.F.R. §1520(a)(3). In opposition, the Commissioner contends that the ALJ

considered these records as established by the above-mentioned citations thereto and, thus, did

not err in this regard. (Doc. 11 at 10-11). The Court agrees with the Commissioner to the extent

that the ALJ's minimal reference to the evidence from Dr. Ford-Crawford demonstrates that its

existence in the record was not completely ignored by the ALJ.

Next, the Court considers plaintiff's argument that the evidence from Dr. Ford-Crawford

establishes plaintiff meets or equals a Listing. The ALJ found that "[n]o medical source has

stated that the severity of the [plaintiff]'s impairments medically equals a listed impairment."

(Tr. 22). The ALJ's finding is not supported by substantial evidence because Dr. Ford-

Crawford's "Mental Impairment Questionnaire (RFC & Listings)" and interview reflect her

medical opinion that plaintiff meets or medically equals both Listings 12.04 and 12.06.

Listing 12.04 governs affective disorders, such as depressive disorders, and Listing 12.06

governs anxiety-related disorders. The required level of severity for these Listings is met when

both the "paragraph A" and "paragraph B" criteria of the Listings are satisfied, or when the

criteria of "paragraph C" are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

To satisfy the "paragraph A" criteria of Listing 12.04, the mental impairment must result

in medically documented persistence, either continuous or intermittent, of one of the following:

> 1. Depressive syndrome characterized by at least four of the following:
>> a. Anhedonia or pervasive loss of interest in almost all activities; or
>> b. Appetite disturbance with change in weight; or
>> c. Sleep disturbance; or
>> d. Psychomotor agitation or retardation; or
>> e. Decreased energy; or
>> f. Feelings of guilt or worthlessness; or
>> g. Difficulty concentrating or thinking; or

---

issuing interrogatories to Dr. Buban and then held the record open until late May 2011.

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions, or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  To satisfy the "paragraph A" criteria of Listing

12.06, there must be medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

To satisfy the "paragraph B" criteria for both Listing 12.04 and 12.06, the mental

impairment must result in at least two of the following: marked restriction of activities of daily

living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

concentration, persistence, or pace; or repeated episodes of decompensation, each of extended

16

duration. A marked limitation means more than moderate but less than extreme. *Id.*, § 12.00

(C). Repeated episodes of decompensation, each of extended duration, means three episodes

within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. *Id.*, §

12.00(C)(4).

To satisfy the "paragraph C" criteria of Listing 12.04, there must be a medically

documented history of a chronic affective disorder of at least two years which causes more than

minimal limitation on the plaintiff's ability to do basic work activities accompanied by one of the

following: repeated episodes of decompensation, each of extended duration; a residual disease

process that results in such marginal adjustment that a minimal increase in mental demands

would be predicted to cause the plaintiff to decompensate; or a history of one or more years of

the plaintiff being incapable of functioning outside of a highly supportive living arrangement. 20

C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. To satisfy the "paragraph C" criteria of Listing 12.06,

the mental impairment must result in plaintiff's "complete inability to function independently

outside the area of [her] home." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

The "Mental Impairment Questionnaire (RFC & Listings)" completed by Dr. Ford-

Crawford in October 2010 reflects that the doctor diagnosed plaintiff with several mental

impairments (prolonged PTSD, eating disorder NOS/pica/laxative abuse, and bipolar disaffective

disorder) which she deemed disabling. (Doc. 804-10). This RFC form includes Dr. Ford-

Crawford's opinion that plaintiff has persistent and severe symptoms and that she is improving

only minimally with medication and therapy. (Doc. 804). The following symptoms endorsed by

Dr. Ford-Crawford coincide with the paragraph A criteria for Listings 12.04 and 12.06:

anhedonia; appetite disturbance with weight change; decreased energy; thoughts of suicide;

17

feelings of guilt or worthlessness; sleep disturbance; motor tension; apprehensive expectation; vigilance and scanning; persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; and recurrent obsessions or compulsions which are a source of marked distress. (Doc. 805-06). As to the paragraph B criteria, Dr. Ford-Crawford opined that plaintiff had extreme functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and that plaintiff had been decompensated for a year but not hospitalized due to safety contracts with her health providers. (Doc. 808). This establishes that, contrary to the ALJ's assertion, Dr. Ford-Crawford expressed a medical opinion that plaintiff meets or medically equals Listings 12.04 and 12.06.

Further, Dr. Ford-Crawford opined in her interview that plaintiff's mental impairments manifest in a symptomatology that meets or medically equals these listings. With regard to the paragraph A requirements of Listing 12.04, Dr. Ford-Crawford stated that plaintiff's depression includes: plaintiff's abuse of caffeine and laxatives to maintain her weight (Tr. 872); anhedonia (Tr. 873); problems with sleep (Tr. 873); poor concentration (Tr. 873); suicidal ideation (Tr. 873); loss of interest in any activity (Tr. 873); psychomotor agitation (Tr. 874); and "lots of guilt feelings . . . and ongoing feelings of low self-esteem and worthlessness." (Tr. 874). As for the paragraph A requirements of Listing 12.06, Dr. Ford-Crawford opined that plaintiff suffers from PTSD due to physical and sexual abuse she experienced both as a child and as an adult that has

resulted in recurrent and intrusive recollections of a traumatic experience and that these are a

source of marked distress. (Tr. 872, 874). Dr. Ford-Crawford's observations and opinions in this

regard are supported by notations throughout plaintiff's medical records. *See, e.g.*, Tr. 415, 492,

502, 508, 694, 698, 710, 753, 783, 791. The undersigned thus finds that Dr. Ford-Crawford

opined that plaintiff's mental impairments meet or medically equal the "paragraph A" criteria for

both Listing 12.04 and Listing 12.06.

Similarly, Dr. Ford-Crawford opined that plaintiff meets the "paragraph B" criteria of

these listings. Dr. Ford-Crawford stated that plaintiff has extreme functional limitations in

activities of daily living as she struggles to get out of bed and believed the only reasons plaintiff

eventually leaves bed is to care for her young daughter. (Tr. 874). She further opined that

plaintiff has extreme functional limitations in her ability to maintain concentration, persistence,

and pace as plaintiff's anxiety and intrusive thoughts related to past abuse are intrusive and make

concentration difficult. (Tr. 875). In a March 7, 2011 letter that Dr. Ford-Crawford drafted to

the ALJ to express her disagreement with the opinion of the ME, the doctor stated that plaintiff's

"malnourishment due to her eating disorder affects concentration . . . [plaintiff] is minimally, at

best, able to function in social situations." (Tr. 842). These opinions are consistent with the

prior assessment completed by Dr. Ford-Crawford. *See* Tr. 804-10. The evidence from Dr.

Ford-Crawford clearly shows that plaintiff's mental impairments result in extreme limitations

satisfying the paragraph B criteria of both Listing 12.04 and Listing 12.06.

In light of the above, there can be no doubt that Dr. Ford-Crawford expressed a medical

opinion that plaintiff's mental impairments meet or medically equal Listing 12.04 and 12.06.

The ALJ therefore erred when he stated that "[n]o medical source has stated that the severity of

the [plaintiff]'s impairments medically equals a listed impairment." (Tr. 22). Further, because the undersigned finds that the ALJ erred in discounting the weight given to Dr. Ford-Crawford's opinions, as discussed below, this error is not harmless.

   2. <u>The ALJ improperly discounted the opinions of plaintiff's treating psychiatrist.</u>

   The RFC formulated by the ALJ provided that plaintiff "can understand, remember, and carry out simple and detailed tasks and some complex tasks. She can interact no more than occasionally with supervisors, coworkers, the general public, and small group settings. She cannot perform fast-paced work with high production demands." (Tr. 23). In making this determination, the ALJ relied on the opinions of: (1) one-time consultative examiners Dr. Berg (Tr. 523-29) and Dr. Leisgang (Tr. 642-47); (2) non-examining state agency reviewing doctors Dr. Waddell (Tr. 538-55), Dr. Semmelman (Tr. 650-68), and Dr. Collins (Tr. 677); and (3) the testimony and answers to written interrogatories of Dr. Buban. The ALJ gave "great weight" to the opinions of Dr. Berg and Dr. Leisgang, with less weight to Dr. Leisgang's opinion due to its reliance on plaintiff's reports; "great weight" to the opinions of Dr. Waddell, Dr. Semmelman, and Dr. Collins; and "significant weight" to Dr. Buban's opinions. Dr. Ford-Crawford's opinions were given "less weight" as the ALJ determined that they were not fully supported by her own treatment notes; highly dependent on plaintiff's reports which the ALJ deemed not credible; and inconsistent with those reports by plaintiff which the ALJ deemed credible. For the reasons that follow, the ALJ erred in discounting the weight given to Dr. Ford-Crawford's opinion.

   It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927 in determining what weight to give the opinion. *See Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. §§ 404.1527(c)(2)(i)(ii), 416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend

to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. § 404.1527(d)(2)[3]).  Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p).

The ALJ gave "less weight" to Dr. Ford-Crawford's opinions because: (1) "[h]er opinions are not fully supported by her own treatment notes"; (2) they "do not reflect the credible portion of the evidence pertaining to the activities of daily living"; and (3) they "are highly dependent on [plaintiff], whom the [ALJ] finds to be an unreliable reporter of symptoms and limitations." (Tr. 25).  The Court finds that the ALJ's stated bases for discounting Dr. Ford-Crawford's opinion are not "good reasons" pursuant to *Wilson*.

First, while the ALJ summarily concluded that Dr. Ford-Crawford's opinions were not "fully supported" by her treatment notes (Tr. 25), he failed to identify in what manner the treatment notes did not support her opinions.  Moreover, review of Dr. Ford-Crawford's treatment notes reveals that her opinions on plaintiff's functionality are more than adequately supported by her treatment notes such that the ALJ's finding is not substantially supported.  For example, treatment notes from GCB consistently contain providers' observations of plaintiff's confusion, low self-esteem, unstable moods, insufficient communication skills, lack of facial

---

[3]Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012.  The provision governing the weight to be afforded a medical opinion that was previously found at § 404.1527(d) is now found at § 404.1527(c).

expression and no eye contact, and tearfulness. (Tr. 429, 431, 435, 441, 447, 471, 475, 502). On

August 9, 2007, the treatment notes provide that plaintiff was extremely depressed and the

interviewer wrote "[plaintiff] recently O/D on neurontin – EMT were able to tx – uncertain why

no hospitalization." (Tr. 449). Dr. Ford-Crawford further observed that plaintiff appeared

guarded with dysphoric mood and restricted affect. (Tr. 492, 502). While plaintiff was observed

as stable with "ok sleep" being reported in October 2010 (Tr. 824), just a few weeks prior she

presented as tearful with increased anxiety, reported an increase in the use of enemas, and was

not eating food but eating corn starch directly from the box. (Tr. 831, 834). The Court further

notes that Dr. Ford-Crawford expressed to the ALJ in her letter that any inconsistency between

her treatment notes and opinions was a result of her failure "to convey the severity of [plaintiff's]

symptoms in [her] progress notes." *See* Tr. 843. Given the consistency of the treatment notes

with Dr. Ford-Crawford's opinions and the ALJ's failure to cite to any evidence whatsoever

supporting his conclusory statement that the notes do not "fully support" said opinions, the Court

finds that the ALJ's decision to discount Dr. Ford-Crawford's opinions due to lack of "full"

support is not supported by substantial evidence.

Second, to the extent the ALJ rejected Dr. Ford-Crawford's opinions because they are not

consistent with the portion of plaintiff's statements which he deems credible and are overly

reliant on those which he deems not credible, such selective reliance on the record is an

inappropriate basis for rejecting the opinion of a treating physician. In the context of mental

impairments, plaintiff's subjective statements are an appropriate basis for a doctor's opinion on

functional abilities. *See Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) (citing 20

C.F.R. § 404.1529). In the arena of mental health treatment, it is often the case that

psychological professionals are required to rely primarily on the statements of patients in forming

their diagnoses and opinions; such "talk therapy" is the underpinning of psychiatric treatment and

therapists may rely on subjective complaints elicited from patients during clinical interviews in

formulating their medical opinions on functional limitations. *See Warford v. Astrue*, No. 09-52,

2010 WL 3190756, at *6 (E.D. Ky. Aug. 11, 2010) (relying on *Blankenship*, 874 F.2d at 1121).

Consequently, the fact that Dr. Ford-Crawford relied, in part, on plaintiff's subjective reports in

formulating her opinions is not a sufficient basis for discounting them given the acceptance of

this diagnostic method in the field of mental health treatment. Moreover, a review of Dr. Ford-

Crawford's treatment notes does not indicate that this treating psychiatrist believed that plaintiff

was untruthful or exaggerated her symptoms. To the contrary, Dr. Ford-Crawford indicated on

the "Mental Health Questionnaire" that plaintiff was not a malingerer. (Tr. 808).

      In sum, the ALJ's decision to discount the opinion of Dr. Ford-Crawford is not

substantially supported by the record evidence. The ALJ summarily rejected the opinions of a

long-time treating psychiatrist without citing any specific evidence supporting his conclusion that

the opinions were not supported by treatment records or were overly reliant – or not reliant

enough – on plaintiff's statements. The ALJ's non-specific rationales, when contradicted by a

treatment record demonstrating plaintiff's extreme limitations due to her mental health

impairments, are not "good reasons" under *Wilson* for rejecting a treating physician's otherwise

well-supported opinion. Plaintiff's second assignment of error should be sustained.

      3. The ALJ erred in discounting plaintiff's credibility.

      For her final assignment of error, plaintiff contends the ALJ erred in discounting her

credibility. Plaintiff asserts the ALJ erred in this regard by: (1) selectively citing to evidence supporting his opinion and ignoring contradictory evidence; (2) improperly characterizing evidence; (3) failing to consider evidence regarding plaintiff's purported non-compliance with medical treatment; and (4) relying on plaintiff's receipt of unemployment benefits to find her less than fully credible. (Doc. 10 at 8-11). Plaintiff further contends that the ALJ erroneously discounted her credibility based on the questions posed to her by counsel at the ALJ hearing. For the following reasons, plaintiff's arguments are well-taken.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247 (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Rogers,* 486 F.3d at 247. Rather, such determination must find support in the record. *Id.* Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her

complaints "based on a consideration of the entire case record." *Id.* Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

The ALJ provided several bases for finding plaintiff "not fully credible." (Tr. 24). The Court will address each in turn.[4]

First, the ALJ found that plaintiff's allegations of disabling depression were contradicted by a lack of evidence of recent psychiatric hospitalizations and her ability to engage in daily chores. As to the lack of recent psychiatric hospitalizations, the record evidence clearly demonstrates that plaintiff has been consistently identified as a suicide risk and has attempted suicide. *See* Tr. 419, 421, 451. Further, plaintiff's case manager testified that she and Dr. Ford-Crawford agreed to not hospitalize plaintiff provided that she sign a "contract to safety" and contact GCB personnel in the event that plaintiff was experiencing suicidal thoughts. (Tr. 97-98). The ALJ's failure to address this evidence denotes a lack of substantial support for his determination. Insofar as plaintiff reported being able to complete certain daily household chores, it is entirely unclear how this is inconsistent with reports of disabling depression. The issue is not whether plaintiff is capable of occasionally picking up after herself or making a meal, but whether she can function appropriately around others in an employment setting for a sustained period. The ALJ's decision fails to explain this purported contradiction; consequently, it does not provide substantial support for discounting plaintiff's credibility.

---

[4]As plaintiff has not raised any errors regarding her physical impairments and statements related thereto, the Court's discussion is limited to the ALJ's credibility finding as it relates to plaintiff's mental impairments.

26

Second, the ALJ deemed plaintiff not fully credible for making purportedly inconsistent statements such as reporting that she spends a lot of time caring for her children (Tr. 670) and later stating that she never leaves her apartment or even her room. (Tr. 850). The ALJ's superficial summary of this evidence does not adequately portray the evidence. Plaintiff indeed stated on June 16, 2009, to a consultative examiner seeing plaintiff for her back impairment, that she spent a lot of time caring for her children. (Tr. 670). However, plaintiff also reported on multiple occasions that she was having difficulty caring for her children and that she has even exhibited abusive behavior which caused her distress. *See* Tr. 447 (plaintiff reported that her daughter decided to live with her father); Tr. 510 (plaintiff reported great distress over not being able to care for her children and feeling overwhelmed by the responsibility); Tr. 698 (plaintiff reported explosive anger and putting bruises on her daughter). The ALJ's selective and cursory analysis of the evidence describing plaintiff as consistently being capable of caring for her children fails to accurately characterize the record evidence. The ongoing reports of significant stress and explosive anger strongly support plaintiff's statements that she has disabling mental impairments despite her ongoing efforts to care for her children. Further, plaintiff's statement regarding not leaving her home were made nearly two years after the consultative examination, and at a time when Dr. Ford-Crawford reported to ALJ McNeal that "it would be impossible for anyone with actual contact with this patient to say she has mild restrictions of ADL's. This person usually has difficulty leaving her house and unless absolutely necessary, will stay on her couch due to fear [and] anxiety. Flashbacks of past severe trauma cause her to keep herself awake at night." (Tr. 842). The ALJ's credibility finding is thus not substantially supported in this regard.

27

The ALJ also found that plaintiff's testimony that she watches TV a lot was inconsistent with reports she made to medical providers that "she moved the TV's into her children's room because they 'made too much noise' even when they were off . . . ." (Tr. 24, citing Tr. 850).[5] The ALJ's reliance on plaintiff's statement – that her televisions make noise when turned off – to support finding her less than credible is astonishing.   Rather than recognize that plaintiff was reporting auditory hallucinations to her treating psychiatrist, the only thing the ALJ chose to glean from this record was that plaintiff's statements were inconsistent with her testimony.   Such selective review of the evidence cannot form substantial support for an ALJ's credibility finding, especially where, as here, the evidence cited demonstrates the extent of plaintiff's mental impairments.

Third, the ALJ determined that plaintiff's non-compliance with medical treatment was a basis for discounting her credibility.   *See* Tr. 24.  Plaintiff's purported non-compliance does not justify the ALJ's decision to discount her credibility in light of the record evidence.   The Court notes that Dr. Ford-Crawford addressed this issue directly to the ALJ in her March 7, 2011 letter, which explained that plaintiff's eating disorder has negatively affected her ability to get appropriate doses of medication and that plaintiff is often housebound due to her fears and anxiety. (Tr. 842-43).  The ALJ's decision makes no mention of Dr. Ford-Crawford's explanation of plaintiff's purported non-compliance.   "[W]hen an ALJ fails to mention relevant evidence in his or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"   *Bledsoe v. Comm'r of Soc. Sec.*, No. 09cv564, 2010 WL

---

[5]The ALJ omits the balance of the treatment note, which states in full: "Clt reports, 'I'm not good at meeting new people' and then began to cry uncontrollably at start of assessment.  Clt has a eating disorder that she has little insight into-eats paper, no motivation to eat, gives herself enemas every other day and bowel system no longer functions per pcp.  Clt reports she never leaves her apartment or even room – moved tv's into her childrens' rooms

5795503, at *3 (S.D. Ohio Aug. 31, 2010) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The undersigned is therefore unable to meaningfully review the ALJ's decision in this regard as it is impossible to determine whether the ALJ considered this relevant evidence in weighing Dr. Ford-Crawford's opinion.

Moreover, "federal courts have recognized that a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (internal quotations omitted) (and numerous cases cited therein). The ALJ never questioned the plaintiff at the hearing about her lack of mental health treatment. Such questioning is crucial in cases such as this, where the plaintiff's mental impairment may, itself, be the cause of her failure to seek or comply with treatment. *See Blankenship v. Bowen*, 874 F.2d 116, 1124 (6th Cir. 1989) (questioning the practice of censuring plaintiffs with mental impairments for exercising poor judgment in not seeking treatment). Here, plaintiff testified that she does not take prescribed sleep medications but, rather, drinks caffeinated beverages to avoid sleep due to nightmares. (Tr. 93-94). Dr. Ford-Crawford noted that plaintiff keeps herself awake at night to avoid flashbacks of past severe trauma. (Tr. 842). The ALJ again erred by failing to acknowledge this pertinent evidence in his decision.

In light of plaintiff's documented eating disorder and the opinion of a medical professional that this has affected her ability to take proper medication dosages, as well as the evidence that non-compliance with treatment is related to plaintiff's PTSD, the ALJ's citation to

---

because they made 'too much noise' even when they are off." (Tr, 850)

non-compliance is not a proper basis to discount plaintiff's credibility. *See Pate-Fires*, 564 F.3d at 945.

Fourth, the ALJ discounted plaintiff's credibility because she was receiving unemployment compensation after her alleged disability onset date and, accordingly, would have been required to report that she was able to work during this time. (Tr. 25). The Sixth Circuit has held that the receipt of unemployment benefits is "inherently inconsistent" with seeking disability benefits and that this inconsistency is properly considered by the ALJ in making a credibility determination. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004). The ALJ's consideration of plaintiff's unemployment compensation in weighing her credibility was thus permissible. The fact that plaintiff collected unemployment benefits, however, does not mean that she is capable of work. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). Further, in consideration of the other flaws contained in the ALJ's credibility analysis, this sole basis for critiquing plaintiff's credibility is not enough to warrant affirmation.

For these reasons, the undersigned finds that the ALJ's decision to discount plaintiff's credibility is not supported by substantial evidence and plaintiff's third assignment of error should be sustained.

### III. This matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.

When the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

30

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec. of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec. of H.H.S.*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Such is the case here.

Here, proof of disability is overwhelming and remand will serve no purpose other than delay. As discussed above, based on the mental residual functional capacity/Listing assessment, narrative reports, and written transcript of Dr. Ford-Crawford, plaintiff's severe psychiatric conditions meet the criteria for Listings 12.04 and 12.06 and prevent her from sustaining gainful employment, at least as of October 2010. The only question in this case is the appropriate onset date of disability. Since the determination of the onset date of disability is a factual issue, this matter should be remanded solely for a determination of the appropriate onset date and an award of benefits.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** pursuant to Sentence Four of 42 U.S.C. § 405(g) consistent with this opinion and remanded for a determination of the appropriate onset date and an award of benefits.

Date: 1/15/2014

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KIMBERLY SMITH,
    Plaintiff,

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:12-cv-904
Barrett, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).